

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-24-00245-CV

---

## IN THE INTEREST OF D.D.J.-C. AND N.M.C.-J., CHILDREN

---

On Appeal from the 287th District Court
Parmer County, Texas
Trial Court No. 11728, Honorable Kathryn H. Gurley, Presiding

---

February 4, 2025

## MEMORANDUM OPINION

### Before PARKER and DOSS and YARBROUGH, JJ.

Appellant M.J.-C. appeals the trial court's termination of her parent-child relationship with her children, D.D.J.-C. and N.M.C.-J.[1]  Mother raises the following issues: (1) the evidence was insufficient to support a judgment of termination under section 161.001(b)(1)(D) of the Texas Family Code; and (2) the evidence was insufficient to support a judgment of termination under section 161.001(b)(1)(Q) of the Texas Family Code.  We reverse.

---

[1] To protect the privacy of the parties, we refer to the children by their initials and to Appellant as "Mother."  See TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b).

BACKGROUND

In July 2022, the Texas Department of Family and Protectives Services (the "Department") received an intake stating Mother had been arrested and there were no appropriate caregivers for her children. Mother was arrested by federal authorities for harboring illegal aliens in her home,[2] none of whom were related to her children. The Federal Bureau of Investigation informed the Department it intended to charge Mother with a felony and then deport her upon her conviction due to her lack of legal status. In November of 2022, Mother pleaded guilty to one count of the indictment. In March of 2023, she was sentenced to twenty-four months' imprisonment. Before Mother's sentence was completed, she was transferred to Immigration and Customs Enforcement for deportation.

The Department petitioned the trial court for conservatorship of the children and to terminate Mother's parent-child relationship with them. The final hearing was held in May 2024 after several delays. After conducting a hearing in which Mother appeared remotely from an ICE detention center by phone call, the presiding associate judge found by clear and convincing evidence grounds for termination existed under Texas Family Code subsections 161.001(b)(1)(D), (E), (O), and (Q).[3] She also found that termination was in the best interest of the children under § 161.001(b)(2). Mother requested a de novo hearing with the trial court, and during the pendency of the hearing, she was deported to Guatemala. The trial court reviewed the record and held a de novo hearing and

---

[2] *See* 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(B)(ii).

[3] Further references to provisions of the Texas Family Code will be by reference to "section __" or "§ __."

determined the basis for termination of Mother's rights as subsections (b)(1)(D) and (Q). It also found that termination was in the best interest of the children.[4] The trial court appointed the Department as the permanent managing conservator of the children.

## APPLICABLE LAW

The Texas Family Code permits a court to terminate the relationship between a parent and a child if the Department establishes one or more acts or omissions enumerated under section 161.001(b)(1) of the Code and that termination of that relationship is in the best interest of the child. *See* § 161.001(b)(1), (2); *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). The Due Process Clause of the United States Constitution and section 161.001 of the Texas Family Code require application of the heightened standard of clear and convincing evidence in cases involving involuntary termination of parental rights. *See In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); s*ee also* § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007. Only one statutory ground is needed to support termination, though the trial court must also find that termination is in a child's best interest. *In re K.C.B.*, 280 S.W.3d 888, 894–95 (Tex. App.—Amarillo 2009, pet. denied).

## STANDARD OF REVIEW

In a legal sufficiency challenge, we credit evidence that supports the judgment if a reasonable factfinder could have done so and disregard contrary evidence unless a

---

[4] The fathers' parental rights were also terminated by the trial court. They have not appealed.

reasonable factfinder could not have done so. *In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014). However, the reviewing court should not disregard undisputed facts that do not support the verdict to determine whether there is clear and convincing evidence. *Id.* at 113. In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *Id.* If, after conducting a legal sufficiency review, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then the evidence is legally insufficient. *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266).

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266 (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

4

Issue One: Evidence Supporting Termination under Subsection (D)

In her first issue, Mother contends there was legally and factually insufficient evidence to support the termination of her parental rights under subsection (D), which provides:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]

§ 161.001(b)(1)(D). Subsection (D) focuses on the children's surroundings and environment, and termination under this subsection requires that the children's environment was endangering to their physical or emotional well-being. *In re N.M.L.*, No. 07-17-00310-CV, 2018 Tex. App. LEXIS 607, at *11 (Tex. App.—Amarillo Jan. 19, 2018, pet. denied) (mem. op). "Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A child is endangered when the environment creates a potential for danger which the parent is aware of but consciously disregards. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate can create an environment that endangers the physical and emotional well-being of the child. *In re A.F.*, No. 14-17-00394-CV, 2017 Tex. App. LEXIS 9814, at *22 (Tex. App.—Houston [14th Dist.] Oct. 19, 2017, no pet.) (mem. op.).

The Department alleges that Mother "endangered the children because she jeopardized their physical and emotional well-being by exposing them to strangers and illegal activity . . . ." This charge is premised on Mother's conviction for violating 8 U.S.C. § 1324, which makes it a crime for any person who,

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . .

8 U.S.C.S. § 1324(a)(1)(A)(iii). Mother argues the Department failed to present any evidence that Mother's conduct in harboring illegal aliens created an environment that endangered the children as contemplated by subsection (D).

Mother acknowledged that she did not know all of the other people who lived in her home. According to Mother, they were there at the request of her cousin, who also lived in the home. Mother indicated that unknown individuals began coming to the home about three months before her arrest. Although Mother did not want to allow the unknown individuals into the home, her cousin told her that she "needed to help him" and she was afraid to refuse. She testified, "I don't know who they are, and I didn't know that they were a danger. I never put my children in danger – in danger's way." Mother explained that she never left her children alone in the home, stating, "I never just left them alone there. I was always there with them, at that time. I was with them there at the house, and we were closed in the room." Mother testified that although she and the children were under the same roof as strangers, her children were never unattended. Mother paid a babysitter or left her children with a family member when she was at work, and when she was not at work, she and her children remained separate from the other people in the

6

house. Mother said that the other people in the home never hurt her children, either physically or mentally.

Although Mother admitted that there were unknown individuals living under Mother's roof and that Mother was not always present, the caseworker acknowledged that Mother stated that when "she was not there, there was somebody else there." The Department presented minimal evidence, other than speculative and conclusory testimony, to suggest that the children were unsupervised or that other individuals in the home had any access to or contact with Mother's children. The Department's witnesses admitted they did not visit Mother's home. They therefore could not testify regarding the living arrangements or the conditions at the home. The Department did not have any evidence that the children suffered from any physical or emotional abuse or neglect.

Testimony from the Department's witnesses indicated that the Department's primary concern was the presence of strangers in Mother's home:

> Q: And is [the termination petition] based on the fact that [Mother] has endangered her children by allowing them to be in conditions and surroundings that were endangering to them?
> A: Yes.
> Q: And how did she do that?
> A: By allowing strangers to come in and out of her home.

And:

> Q: What conditions or surroundings endangered those children?
> A: All of the unknowns in the house; all of the strangers living there for an extended period of time, until they went somewhere else. Yeah, I think that that's the big one.
> Q: So just because the children were around strangers, then the Department's position is that their physical or emotional well-being was in danger?

A: Yes.

The Department did not speak to the other persons arrested with Mother and did not know the background or history of the people present in the home, including whether they had any criminal history. When asked if she knew whether the people at the house were dangerous, the caseworker answered, "I can't confirm if they were or not, no." She admitted she had no evidence that they were dangerous. She acknowledged that there was a "possibility" that they were "very good people." The caseworker for the Department acknowledged that the Department assumed that the children's environment presented a risk because of the lack of information about the other residents there:

> Q: Are we just assuming, because they weren't citizens, or resident aliens, that they were dangerous people?
>
> A: We're making that decision based on the lack of information [Mother] had on people living in the home.
>
> Q: So it's just an assumption. Correct?
>
> A: Correct.

One caseworker testified that the Department believed Mother endangered her children because of "[t]he risk of leaving the children in a home with strangers while she was not present. The risk of being arrested. The risk of the children being left vulnerable with no relatives named at the beginning and no place to go."

The law provides that the Department's allegations against a parent must be supported by clear and convincing evidence; conjecture is not enough. *See In re E.N.C.*, 384 S.W.3d at 810. Showing that conditions have the potential to be dangerous is not the same as showing endangerment by clear and convincing evidence. *See, e.g., A.S.*

*v. Tex. Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.) (where Department was "concerned" about domestic violence but failed to explain nature of concerns or present evidence that domestic violence had occurred, court could not conclude that any danger to children from such violence rose above mere suspicion or speculation).  For example, while a parent's use of illegal drugs is both unlawful and unsafe, like Mother's criminal activity in this case, it does not inevitably establish endangerment.  In *In re R.R.A.*, the Texas Supreme Court clarified the connection between a parent's drug use and endangerment of a child.  *In re R.R.A.*, 687 S.W.3d 269, 276–78 (Tex. 2024).  The court concluded,

> While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm.  A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's "ability to parent."

*Id.* at 278 (emphasis in original).

In this case, the Department did not establish the existence of circumstances indicating that the conditions in the home endangered Mother's children or presented a substantial risk of harm.  Had the Department established other facts, such as violence, drug use, or other dangerous behavior by the other people in the household, or shown that Mother left her children in the care of strangers, the outcome would likely differ.  But it appears that the Department did not investigate the home or the people in it.  We are reluctant to conclude that the mere presence of unknown individuals in Mother's home,

9

even individuals in the country illegally, in and of itself creates an environment that endangered the physical or emotional well-being of her children.

We do not minimize the Department's allegations or in any way condone the circumstances that led to the children's removal in this case. However, the Department bore the burden to prove that the children's surroundings endangered their physical or emotional well-being or created a potential for danger which Mother was aware of but consciously disregarded. On the record before us, we conclude the evidence is both legally and factually insufficient to meet that burden. Therefore, we sustain Mother's first issue.

Issue Two: Evidence Supporting Termination under Subsection (Q)

Mother's second issue challenges the sufficiency of the evidence supporting the trial court's finding under subsection (Q), which permits termination if the court finds, by clear and convincing evidence, that the parent has been convicted of an offense and imprisoned and unable to care for her child for not less than two years. § 161.001(b)(1)(Q); *In the Interest of A.V.*, 113 S.W.3d 355, 360 (Tex. 2003). The Department must prove both that the parent will be incarcerated or confined *and* unable to care for the child for at least two years. *In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006); *see In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.) ("Proof that [the incarcerated parent] is unable to care for [the child] is an additional requirement not met by showing incarceration alone.").

In this case, Mother does not dispute that she was convicted of harboring an illegal alien and was sentenced to twenty-four months' incarceration. She contends, however,

that the record does not show that she was incarcerated or confined for two years, nor does it establish that she was unable to care for her children for at least two years.

The Department filed its petition seeking termination of Mother's rights on July 19, 2022. Therefore, under subsection (Q), the Department was required to prove that Mother would be confined or imprisoned and unable to care for the children until July 19, 2024. *See In re H.O.*, 555 S.W.3d 245, 252 n.6 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (measuring subsection (Q)'s two-year time period from date of original petition seeking termination). The evidence shows that Mother was sentenced in March of 2023 and that by early 2024, she had been transferred to the custody of ICE. By the time of the de novo hearing on July 22, 2024, Mother had been deported to Guatemala. However, the record does not reveal the date of her deportation. Consequently, we see no evidence to support a finding that Mother was confined or imprisoned for the requisite two-year period ending on July 19, 2024.[5]

Further, under subsection (Q), the requirement of clear and convincing evidence of an "inability to care for the child" is not met on the mere showing of prolonged incarceration. *In re J.G.S.*, 574 S.W.3d 101, 118 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). As we have explained,

> [O]nce the Department has established a parent's knowing criminal conduct resulting in their incarceration for more than two years, the parent must produce some evidence as to how they would provide or arrange to provide care for the child during that period. When that burden of production is met, the Department would have the burden of persuasion that the arrangement would not satisfy the parent's duty to the child.

---

[5] The Department's appellate brief does not address Mother's challenge to termination of her rights under subsection (Q).

*In re Caballero*, 53 S.W.3d 391, 397 (Tex. App.—Amarillo 2001, pet. denied) (op. on reh'g); *see also Brickley v. Joseph-Stephen*, No. 03-22-00574-CV, 2023 Tex. App. LEXIS 1367, at *5 (Tex. App.—Austin Mar. 2, 2023, pet. denied) (mem. op.) (explaining three-step burden-shifting framework of subsection (Q)).

Even assuming that the Department produced evidence of Mother's criminal conduct resulting in her confinement for two or more years, the burden would then shifted to Mother to produce some evidence of how she would provide for the children during that period. The record indicates that Mother had a support system in her native Guatemala that would assist her and her children. Mother testified that her father, mother, grandfather, sisters, and aunts live in Guatemala and are willing to help care for her children. Additionally, Mother had a plan for supporting herself and her children when she herself returned to Guatemala. *See In re E.N.C.*, 384 S.W.3d at 806 ("Unlike an incarcerated individual, a person who is deported is able to work, have a home, and support a family. More importantly, it is possible for the person's children to live with him."). Mother testified that she and the children would live with her father, who has a four-bedroom house. She stated that there are schools "just 20 minutes away" and that she would drop off her children and pick them up from school. She also said that there were doctors, dentists, and counselors in the town. Mother planned to work so that she could provide for her children. She testified that she had saved money and sent money to Guatemala to start a store there. We conclude that this evidence was sufficient for Mother to meet her burden of production.

Once Mother met her burden of production, the third step shifts the burden back to the party seeking termination. *See Brickley*, 2023 Tex. App. LEXIS 1367, at *5. That

12

party, in this case the Department, then had the burden of persuasion to show that the parent's provision or arrangement would not adequately satisfy the parent's duty to the child. *In re J.G.S.*, 574 S.W.3d at 120. In this case, the Department directs us to no evidence challenging Mother's planned arrangements or indicating that her plans would not adequately satisfy her duty to care for her children.

Therefore, we conclude the evidence is insufficient to support a finding that Mother's criminal conduct resulted in her "confinement or imprisonment and inability to care for the child[ren] for not less than two years from the date of filing the petition" under subsection (Q). We sustain Mother's second issue.

## CONCLUSION

Having found the evidence to be both legally and factually insufficient to support the predicate grounds of subsections (D) and (Q), we reverse the trial court's order of termination as to Mother. We do not disturb other parts of the trial court's order, including the appointment of the Department as the children's permanent managing conservator, because Mother does not challenge any part of the order other than the termination of her parental rights. *See In re J.A.J.*, 243 S.W.3d 611, 617 (Tex. 2007).

Judy C. Parker
Justice

Doss, J., concurring.
Yarbrough, J., dissenting.

13